## Succession of RYAN v. LIFE & CASUALTY INS. CO. OF TENNESSEE.

### No. 17438.

Court of Appeal of Louisiana. Orleans.

Nov. 18, 1940.

Rehearing Denied Dec. 2, 1940.

Writ of Certiorari Denied Feb. 3, 1941.

Harry R. Cabral, of New Orleans, for appellant.

Deutsch and Kerrigan, of New Orleans. for appellee.

McCALEB, Judge.

On December 13, 1937, James I. Ryan applied in writing to the defendant, Life & Casualty Insurance Company of Tennessee, for the issuance of an industrial insurance policy upon his life in the sum of $500. In answer to certain questions contained in the application regarding the condition of his health, he stated that he had never had any of the following complaints or diseases: "Disease of the brain, disease of the heart, disease of kidneys, disease of liver, disease of urinary organs * * *". He further stated that he was in sound health and that he had not been under the care of any physician within three years. This application for insurance was subsequently approved by the defendant company and on December 27, 1937, it issued to Ryan a policy of industrial life insurance providing for the payment to his estate the sum of $500 upon his death. On December 31, 1937, or three days after the issuance of the policy, Ryan died as a result of acute alcoholism, edema of brain, cirrhosis of liver and chronic myocarditis.

Ryan's succession was opened shortly after his death and Julius Szodomka, the plaintiff, was duly appointed and qualified as administrator of his estate. After his appointment, Szodomka filed with the defendant a proof of the assured's death and made claim upon it for payment of the avails of the insurance. Upon the rejection of his demand by the defendant, he, as administrator of Ryan's succession, filed this suit to recover the proceeds of the policy.

The defendant company resists liability on the ground that Ryan, the assured, was guilty of fraud in the procurement of the insurance in that he wilfully misrepresented the true condition of his health at the time he made written application to it for the issuance of the policy. It charges that, whereas Ryan stated in his written application that he had never suffered with disease, in truth and in fact, he was not only afflicted with high blood pressure, heart trouble and cirrhosis of the liver, from which he subsequently died, but that he had full knowledge that he was suffering from these ailments at the time he applied for the insurance.

After a trial in the District Court on this issue, there was judgment in plaintiff's favor for the amount claimed and the defendant has prosecuted this appeal from the adverse decision.

At the trial of the case in the District Court, the plaintiff objected to the introduc-

tion of any evidence by the defendant to establish its defense of fraud on the part of the assured in procuring the insurance. This objection was overruled by the trial judge and the defendant was permitted to submit proof in support of the charges made by it in its answer. Counsel for plaintiff maintain in this court that the objection should have been sustained for the reason that the policy sued upon is governed by the provisions of Act No. 144 of 1936 and that, under that statute, the defense of fraud has been waived since the insurance company is presumed to have had full knowledge concerning the health and habits of the assured where it has issued the policy without requiring the assured to undergo a medical examination. In support of their position, counsel direct our attention to our decision in the recent case of Bordelon v. National Life & Accident Insurance Co., La.App., 187 So. 112.

In the Bordelon case, the plaintiff sued as beneficiary of an industrial insurance policy issued by the defendant upon the life of his wife to recover the proceeds of the insurance. The defendant resisted liability and set up as a special defense that the assured had given false answers regarding the condition of her health upon a written application to the company prior to the issuance of the policy. The plaintiff there, as here, objected to any evidence in proof of the defense thus made on the ground that, under the jurisprudence and the law (Act No. 144 of 1936), the defendant was conclusively presumed to have full knowledge of the habits, health and occupation of the assured where it failed to require, prior to the issuance of the insurance, a medical examination to be made. In sustaining this contention, a majority of this court came to the conclusion that Act No. 144 of 1936 was intended by the Legislature to apply to all policies where the insurance company failed to require the assured to sign a written application for the insurance and did not compel him to undergo a medical examination prior to the issuance of the policy. Notwithstanding this holding, we nevertheless considered the evidence produced by the defendant and ruled that, assuming that such evidence was admissible, it was insufficient to warrant the conclusion that the assured had practiced a fraud upon the defendant.

Thus, it will be observed that the point raised by the plaintiff in the instant case is fully supported by our decision in the Bordelon matter. However, we now have considerable doubt as to the correctness of the interpretation given to Act No. 144 of 1936 by the majority opinion in that case. In fact, a careful reconsideration of the views therein expressed has convinced us that our conclusion, that Act No. 144 of 1936 is applicable to cases where the insurer has required the assured to sign a written application for the insurance, is not well founded. In order to explain with clarity the opinion we now entertain, it is pertinent to review briefly the prior legislation and jurisprudence which, we believe, prompted the Legislature in 1934 to pass Act No. 160 and later in 1936 to enact Act No. 144, the statute now under consideration.

Prior to the adoption of Act No. 160 of 1934 and Act No. 144 of 1936, insurance policies issued in this State were governed by the provisions of Act No. 52 of 1906, as amended by Act No. 227 of 1916 and by Act No. 97 of 1908. Act No. 52 of 1906, as amended, provides that every policy issued by a life insurance company doing business in the State "shall contain the entire contract between the parties and nothing shall be incorporated therein * * * unless the same are endorsed upon or attached to the policy when issued; and all statements purporting to be made by the insured shall in the absence of fraud be deemed representations and not warranties, and no statement or statements not endorsed upon or attached to the policy when issued shall be used in defense of a claim under the policy unless contained in a written application and unless a copy of such statement or statements be endorsed upon or attached to the policy when issued."

Act No. 97 of 1908 provides for the waiver of forfeiture of the policy for misrepresentation on the part of the applicant for insurance when the insurance company fails to have a medical examination made of such applicant prior to issuance of the policy. The pertinent portion of that statute reads as follows: "That whenever life, health or accident insurance companies, which issue policies or contracts of insurance to the assured without a medical examination of the assured by a physician, it shall be presumed (whenever it appears that the agent of the company has had an opportunity to ascertain the true condition of the health, habits or occupation of the assured, and has certified to the company the desirability of the risk), that the knowl-

edge acquired, or which might have been acquired with reasonable diligence by the agent of the company in securing the application, as to the health, habits or occupation of the assured, has been disclosed to his principal; and it shall also be presumed that the company has waived its rights to claim a forfeiture of the policy based on the ground that the assured did not make true and full answers in the application as to the health, habits or occupation * * *."

The foregoing statutes have been interpreted many times by the courts but, up to the year 1934, there was considerable doubt among the members of the bench and the bar as to whether these general laws were applicable to companies engaged in the business of writing industrial life insurance. This uncertainty, however, was definitely settled by the Supreme Court on March 6, 1934, in the case of McBride v. Acme Industrial Life Insurance Society, 179 La. 701, 154 So. 741, where it was held that Act No. 52 of 1906, as amended, and Act No. 97 of 1908 were applicable to companies engaged in the business of writing industrial policies.

The effect of the decision of the Supreme Court in the McBride case was to place industrial life insurance companies on the same footing with the "old line" or legal reserve companies. Thereafter, the court reaffirmed its views, respecting industrial life insurance policies, in the case of Eagan v. Metropolitan Life Insurance Co., 181 La. 16, 158 So. 575. There, it was held that the insurer's failure to cause a physical examination to be made of the assured prior to the issuance of the policy estopped it from contending that the assured had fraudulently procured the insurance because, under such circumstances, and in view of Act No. 97 of 1908, it was presumed to have had full knowledge concerning the health, habits and occupation of the assured notwithstanding stipulations contained in the policy to the contrary.

Shortly after the decision in the McBride case, the Legislature passed Act No. 160 of 1934, which pertains to the issuance of industrial life insurance policies. Section 1 of that Act reads as follows: "That hereafter before any corporation * * * shall issue any policy of industrial life insurance in this State, the applicant for such policy shall be required to make an application in writing therefor to the insurer and to sign the application with his genuine signature, or ordinary mark, as the case may be, in which event the written and signed application shall be the basis for issuing the policy of industrial life insurance so applied for, and shall be a part of the contract of insurance issued thereon, whether or not the application or a copy thereof be attached to or indorsed upon the policy when issued."

In Section 2 of the statute, it is provided that, if any insurance corporation "shall issue any policy of industrial life insurance without obtaining a written and signed application * * * then such unsigned application shall be inadmissible in evidence as a basis of defense in any suit upon the policy by the insured for the collection of the policy, * * *". In Section 3, it is declared that no policy of industrial life insurance shall be void as a consequence of any misrepresentation in the application of the assured "unless such misrepresentation is wilful on the part of the assured and conceals facts as to the ill-health of the assured existing at the time of any such application, and provided further, that fraud shall always be a defense against any suit by the assured, if the insurer shall have obtained an application from the assured as hereinabove provided."

This statute has been considered by us on a number of occasions. The leading case on the subject is that of Fox v. Life Insurance Company of Virginia, La.App., 170 So. 55. There, we held that the act had the effect of changing the prior laws and jurisprudence concerning the defenses available to industrial insurance companies and that, where such a company had required the assured to sign a written application for insurance, the defense of fraud or wilful misrepresentation on the part of the assured in obtaining the policy was available to the insurer in spite of the fact that it did not require the assured to undergo a medical examination to ascertain the condition of his health prior to the issuance of the policy. To the same effect, see Succession of Dekan v. Life Insurance Company of Virginia, La.App., 172 So. 37; Strudwick Funeral Home v. National Life & Accident Insurance Co., La.App., 176 So. 891; Taplin v. Washington National Insurance Co., La.App., 178 So. 514, and Smith v. Southern General Insurance Co., La.App., 179 So. 614.

In 1936, the Legislature passed the statute now under consideration, which pro-

vides as follows: " * * * whenever industrial life, health or accident insurance corporations, issue policies or contracts of insurance to the assured *without a written application or a medical examination of the assured by a physician,* it shall be presumed (whenever it appears that the agent of the corporation has had an opportunity to ascertain the true condition of the health, habits or occupation of the assured, and has certified to the corporation the desirability of the risk), that the knowledge acquired, or which might have been acquired with reasonable diligence by the agent of the corporation in securing the application, as to the health, habits or occupation of the insured, has been disclosed to his principal; and it shall also be presumed that the corporation has waived its rights to claim a forfeiture of the policy, based upon the ground that the assured did not make true and full answers in the application as to health, habits or occupation, whenever it shall appear that the agent of the corporation knew, or might have ascertained with reasonable diligence, the true condition of the applicant's health, or the real facts as to his habits or occupation, knowledge of the agent of the corporation in writing the application or of the collector of the corporation in collecting the premiums from the assured, to be imputed as notice to the corporation. concerning the health, habits or occupation of the assured; provided that the provisions of the Act shall not apply in the cases of reinstatement of policies that have been permitted to lapse, or to policies which have been issued upon a written application or medical examination of the insured." (Italics ours)

It will be noticed, by a comparison of the provisions of the general law (Act No. 97 of 1908) with those of Act No. 144 of 1936, that the language used in the later act, except for two distinct changes relating to the application of the statute, is practically identical with that contained in the former. These changes effected by the Legislature in 1936 have not repealed or altered the provisions of Act No. 97 of 1908 except insofar as that statute has been held to apply to policies of industrial life insurance. As to industrial policies, the changes made by the 1936 Legislature may be stated as follows: (1) Act No. 144 of 1936 is a special law in that it applies exclusively to industrial life, health and accident corporations, whereas Act No. 97 of 1908 applies generally to all life,

health and accident insurance companies, and (2) Act No. 144 of 1936 is applicable only to policies of industrial life insurance issued "without a written application or a medical examination of the assured by a physician", whereas Act No. 97 of 1908 applies to all policies of insurance which are issued without a medical examination of the assured by a physician.

In the majority opinion in the Bordelon case, it was found that, since Act No. 97 of 1908 applied to all life insurance policies, whether industrial or not, which were issued without a medical examination, the Legislature had covered the field and that in 1936 the lawmakers apparently intended to extend the coverage of the 1908 act by making it apply to all industrial life insurance policies unless such policies were written after a medical examination had been performed and, unless the assured had also signed a written application for the insurance. In arriving at this conclusion, the court, in effect, decided that, although the Legislature used the alternative particle "or" in separating the phrase "without a written application" from the phrase "medical examination of the assured by a physician", the language indicated a legislative design to make it necessary that there be both a medical examination and a signed application in order for the provisions of the statute to be inapplicable.

We now think that this interpretation was erroneous. Our present view is, that the language used by the Legislature indicated a clear intention on its part to make the statute inapplicable to policies of industrial life insurance which are issued either upon a written application or a medical examination. The statute is a special one and obviously supersedes the general law (Act No. 97 of 1908). insofar as industrial life insurance policies are concerned. Moreover, should there be any doubt with respect to the intention of the Legislature in the use of the language employed at the beginning of the statute, this ambiguity is clarified by the proviso contained in the Act wherein it is declared: "Provided that the provisions of the Act shall not apply in the cases of reinstatement of policies that have been permitted to lapse, *or to policies which have been issued upon a written application or medical examination of the insured."* (Italics ours)

We are also firmly convinced that the views we now entertain are in keeping with the manifest intent of the Legislature

in recent years to permit industrial insurance companies to plead the defense of fraud in procurement of the policy and to introduce evidence in support thereof where such companies have required the applicant for insurance to file a written application prior to the issuance of the policy. And it certainly cannot be said that it was ever the intention of the Legislature, in enacting Act No. 144 of 1936, to repeal the provisions of Act No. 160 of 1934, wherein it specifically granted to the insurer the right to defend, on the ground of fraud, where application for the insurance had been made in writing, yet, such an unseemly result is manifest if we perpetuate the views we expressed in the Bordelon case.

■ Counsel for plaintiff tell us that we are not authorized to overrule the legal conclusions reached in the Bordelon case since the Supreme Court refused writs of review which had been applied for by the insurance company in that matter. An examination of the reasons given by that Court for its refusal of the writ of certiorari shows that the Court was of the opinion that "the decree is correct". We do not take this to mean that the Supreme Court has placed its stamp of approval upon our reasons in arriving at the conclusion we reached, and this is particularly so since the matter was decided on the merits, notwithstanding the opinion of the majority that the defense of the insurance company should not be considered in view of the interpretation given to Act No. 144 of 1936.

■■ We therefore pass on to a consideration of the defense set forth by the defendant in its answer. In support of its allegations of fraud and wilful misrepresentation on the part of Ryan, the defendant submitted the testimony of Dr. C. Grenes Cole, Dr. Mannie Mallowitz and Dr. Willis R. Wirth.

Dr. Cole, who is the Coroner for the Parish of Orleans, testified that, after Ryan's death, he performed an autopsy on the body and, as a result, he came to the conclusion that the deceased died of acute alcoholism, edema of the brain, cirrhosis of the liver and chronic myocarditis. He concedes that he had never seen Ryan prior to his death and did not know whether the deceased had suffered the diseases from which he died, at the time he filed application for the insurance.

Dr. Mallowitz stated that he is the physician for the defendant company; that he had never seen Ryan either before or after his death but that, judging from the cause of death as found by the Parish Coroner, it was his opinion that Ryan had suffered with the diseases from which he died for quite a long period of time.

The main witness for the defendant was Dr. Willis R. Wirth, who was Ryan's regular physician prior to his death. Dr. Wirth declared, in substance, as follows: That Ryan was a periodical drunkard; that, over a period of some years prior to his death, the deceased would occasionally go on drunken sprees which lasted for several days; that after these debauches he would be called to administer treatment to Ryan which consisted of assisting the latter to become sober; that he was never called upon to treat Ryan for high blood pressure, cirrhosis of the liver or any other disease but that, on the occasions when he visited Ryan, after the latter's drunken sprees, he would warn him "to try to stop drinking, because it was causing him a great deal of damage." He further says: "I warned him many times during the course of my visits and would check his blood pressure and liver for that reason when I saw him, even though it perhaps had no relationship to the treatment of the alcoholism."

It is apparent to us that the foregoing testimony falls far short of establishing fraud on the part of Ryan in the procurement of the insurance. Assuming that Ryan was afflicted with all of the diseases which subsequently caused his death at the time he made application for the insurance, there is nothing to show that he was ever aware of the fact that he had these various ailments. So far as the record goes, he had never called upon a doctor for the treatment of any disease and the only time that he ever summoned a physician was when he was recuperating from one of his drunken sprees. While it is true that Dr. Wirth says that, when he visited Ryan, he warned him against the continued use of intoxicants and told him that his drinking sprees would eventually cause him trouble, the doctor does not attempt to say that Ryan at any time believed or knew that he had cirrhosis of the liver or heart disease or any other ailment which would bring about his sudden death.

In Fox v. Life Insurance Company of Virginia, supra [170 So. 57], in considering what was a wilful misrepresentation on the part of the assured, we said: "The word 'willful' as used in the statute must be reasonably interpreted." Hence, proof of the

fact that the assured was afflicted with disease at the time he applied for insurance, without supporting evidence to show that he had actual knowledge or reasonable ground to believe that he was so afflicted, will not warrant the conclusion that he wilfully misrepresented the true condition of his health in his application. In the instant case, we find no convincing evidence to persuade us to resolve that Ryan knew or had reason to believe that he was suffering with disease at the time he represented to the defendant that he was in good health.

For the reasons assigned, the judgment appealed from is affirmed.

Affirmed.

WESTERFIELD, Judge (concurring).

I am still of the opinion that the interpretation given Act No. 144 of 1936 in the Bordelon case is correct. I therefore concur in the decree.