ELLIS, Judge.
The plaintiff was named as the beneficiary, under.a burial policy dated March 12, 1951 issued by the defendant with Helen Williams, sister of the plaintiff as the insured. On April 13, 1951 Helen Williams, the insured, died suddenly due -to congestive heart failure and upon the refusal of the insurance company to pay the $200 called for by the policy, the plaintiff instituted the present suit.
The defendant relies upon the defense of willful misrepresentation or fraud on the part of the beneficiary in obtaining the policy and particularly upon the defense based on the provision of the policy in dispute that “No obligation is assumed by the Company prior to the date hereof, nor unless on said date the Insured be alive and in sound health.”
After trial judgment was rendered in favor of the plaintiff for the amount provided in the policy, viz., $200, and in the further sum of $100 attorney fees which was imposed as a penalty.
From this judgment the defendant has appealed.
That portion of the judgment awarding $100 attorney fees is unauthorized. 'See LSA-R.S. 22:656 and 22:657, and Grigsby v. First National Life Insurance Company, La.App., 7 So.2d 742. *489 Furthermore, the penalties imposed in this case are not deserved under the facts which will be discussed in full hereafter.
In this case, no medical examination was required or given in order to ascertain the condition of Helen Williams’ health prior to the issuance of the policy and, therefore, the statements of the plaintiff are taken to be representations and not warranties of 'her physical condition, and as to these statements the insurer’s only defense is that of willful misrepresentation or fraud on the part of the insured or beneficiary in obtaining the policy. There is no dispute as to the law applicable to a case of this kind, but the defendant contends that the facts support his defense.
In the case of Fox v. Life Insurance Company of Virginia, La.App., 170 So. 55, 56, 57, Judge Westerfield was the organ of the Court, and in discussing the word “willful” as used in the statute had the following to say:
“The word ‘willful’ as used in the statute must be reasonably interpreted. If, therefore, an applicant neglects to disclose a trivial ailment or medical consultation concerning such ailment, such concealment could not reasonably be regarded as ‘willful’ and have the effect of vitiating the contract of insurance because of fraud on the part of the assured.
“A statement in an application for insurance to .the effect that the applicant is in sound health and has not consulted a doctor within a given period is a representation and not a warranty; the difference between the two being that the falsity of the statement in the one case does not vitiate the policy unless material and of such character as may be presumed to have influenced. the insurer, whereas, in the other case, the falsity of the statement voids the policy whethe% material or not.
“ ‘A representation is material when knowledge of the truth as to the fact misstated might reasonably influence the company in determining whether or not to enter into the contract as made.’ 25 Cyc. 806.”
In the present case, the defense of willful misrepresentation is based mainly upon the answer of “no” in the application for the insurance policy by the plaintiff to the question as to whether Helen Williams, her sister, had ever suffered from heart disease. Under the above cited authority the plaintiff’s representation that her sister had not suffered from heart disease was material and if wilfully misrepresented by the plaintiff it would vitiate the policy. Only the facts can reveal whether or not there was any willful misrepresentation on the part of the insured or her sister, the plaintiff herein.
The record reveals that Helen Williams, the insured, was 20 years of age on the date of her death, and that on February 5, 1951 she had premature twins according to the hospital record as testified to by a doctor on the trial of the case. This doctor further testified that the deceased could have had eclampsia and had a delivery and recovered. The record did not indicate any previous history of heart trouble, and it was the opinion of this doctor that as Helen Williams had possibly delivered before without any history of heart or kidney disturbance, that he did not think it possible for her to have had organic heart. disease prior to the last pregnancy. He also definitely stated that it was his opinion that the woman died from' eclampsia, which is shown to be a toxemia of pregnancy, and which we gather from the testimony affected the heart.
It is further shown by this record that the agent of the defendant insurance company went by the home of the plaintiff on February 17 and he was told by the plaintiff that she wanted him “to write her sister up in the insurance” and he asked her if she meant now and plaintiff said “No, when you come back on the 24th,” and he went back on the 24th and that is when the application was filled out, the questions were answered by the plaintiff, and the insured’s name was signed by the plaintiff to the application, however, with the *490 full knowledge of the agent who was present. The plaintiff took a policy on all five of her sisters, three of whom were present at the time the application was signed, however, Helen Williams, the deceased, was not present. This application shows that the plaintiff in answering Question 13-B as -to the date of the last confinement for childbirth of Helen Williams gave the agent the correct date of February 5, 1951, but she did answer to Question 22 that her sister had no heart disease. The policy was issued on March 12, 1951, which would be 16 days subsequent to the application for the insurance policy.
The plaintiff testified that the agent of the defendant company, Rev. Parker, came to her house and requested her to obtain insurance on her family, which was after Helen Williams had had the premature babies at the hospital in Bogalusa. It is her positive testimony that she never knew and, in fact, denied that her sister Helen Williams ever had heart disease. The doctors did not tell her and to her knowledge had never told her deceased sister. There is nothing in the record to show that the deceased was aware of the fact that the plaintiff had taken out this burial policy. The hospital record shows that on February 14 the deceased “Appears well.” This is on the “Out Patient Department Progress Notice.” It is shown that on March 15 the deceased returned to the hospital in accordance with the request by her doctor to come back to the next GYN clinic. From the hospital records, at this time she was still sick, however, there is nothing in the record to indicate that the plaintiff or the insured knew the serious nature of the illness. The doctor testified that there was nothing in the record to indicate that the deceased had been examined by the doctor at the hospital on March 15th.
It is true that the deceased at the time of the birth of the premature twins on February 5, 1951 remained in a coma for three days and was given oxygen and the plaintiff visited her during that time.
In our opinion, the plaintiff disclosed all the information sought by the agent of the insurance company when he wrote up the application for the policy of insurance. She frankly stated that her sister had last been confined on February 5, 1951, and we do not believe that she wilfully misrepresented the facts when she answered that her deceased sister did not have any heart disease.' The evidence shows that she had had normal deliveries of three children before and no history of any trouble with her heart or with her kidneys prior to the last pregnancy. It is true that she died of congestive heart trouble but this was due as we interpret the testimony from the toxic condition caused by her pregnancy which finally affected her heart. She was discharged on February 14 as apparently well, which to any layman would not indicate' the present existence of a serious illness. We cannot presume fraud or willful misrepresentation — it must be proven by the defendant company.
The case of Succession of Ryan v. Life and Casualty Insurance Company of Tennessee, La.App., 198 So. 522, 527, states:
“The mam witness for the defendant was Dr. Willis R. Wirth, who was Ryan’s regular physician prior to his death. Dr. Wirth declared, in substance, as follows: That Ryan was a periodical drunkard; that, over a period of some years prior to his death, the deceased would occasionally go on drunken sprees which lasted for several days; that after these debauches he would be called to administer treatment to Ryan which consisted of assisting the latter to become sober; that he was never called upon to treat Ryan for high blood pressure, cirrhosis of the liver or any other disease but that, on the occasions when he visited Ryan, after the latter’s drunken sprees, he would warn him ‘to try to stop drinking, because it was causing him a great deal of damage.’ He further says: T warned him many times during the course of m^ visits and would check his blood pressure and liver for that reason when I saw him, even though it perhaps had no relationship to the treatment of the alcoholism.’
“It is apparent to us that the foregoing testimony falls far short of establishing fraud on the part of Ryan in *491 the procurement of the insurance. Assuming that Ryan was afflicted with all of the diseases which subsequently caused his death at the time he made application for the insurance, there is nothing to show that he was ever aware of the fact that he had these various ailments. So far as the record goes, he had never called upon a doctor for the treatment of any disease and the only time that he ever summoned a physician was when he was recuperating from one of his drunken sprees. While it is true that Dr. Wirth says that, when he visited Ryan, he warned him against the continued use of intoxicants and told him that his drinking sprees would eventually cause him trouble, the doctor does not attempt to say that Ryan at any time believed or knew that he had cirrhosis of the liver or heart disease or any other ailment which would bring about his sudden death.
“In Fox v. Life Insurance Company of Virginia, supra, La.App., 170 So. [55], 57, in considering what was a wilful misrepresentation on the part of the assured, we said: ‘The word “willful” as used in the statutes must be reasonably interpreted.’ Hence, proof of the fact that the assured was afflicted with disease at the time he applied for insurance, without supporting evidence to show that he had actual knowledge or reasonable ground to believe that he was so afflicted, will not warrant the conclusion that he wil-fully misrepresented the true condition of his health in his application. * * ”
The plaintiff apparently was in no hurry to obtain the insurance policy, for the agent. Rev. Parker, came to her house February 17th and at that time asked plaintiff if she wished the policy writtén up then and she replied, “No, the next time you come.” If plaintiff had intended to defraud the insurance company or rather if she had been aware that her sister was seriously ill with heart disease, she would not have delayed a whole week in making application. It is also a fact that she not only applied for insurance for Helen Williams, the deceased, but also for her other four sisterS. Counsel for defendant argues that this was a cover up, however, there is nothing in' the record that leads us to believe that plaintiff was capable of such subterfuge. It appears to have been a natural and normal thought on her part.
It is also a fact that none of the doctors who treated the deceased while she was in the hospital testified. The only medical testimony is that of an outside doctor who expressed his opinion from the record as written during the hospitalization of the deceased.
The evidence fails to show that the plaintiff or. the deceased had actual knowledge or reasonable ground to believe that the latter was inflicted with heart disease and, therefore, we would not be warranted in concluding that the plaintiff wilfully misrepresented the true condition of the deceased’s health in her application.
The defendant places great reliance upon the following cases: Carter v. Life & Casualty Insurance Co., of Tennessee, La.App., 29 So.2d 716; Fox v. Life Insurance Company of Virginia, supra; Gongre v. Life and Casualty Insurance Company of Tennessee, La.App., 36 So.2d 71.
In the Carter case the Court stated [29 So.2d 717]:
“It appears that the assured, Lettié Beoh, signed an application for insurance on the 29th of November, 1943, in which she denied that she had ever had any of the diseases set forth therein (diseases of the brain, liver, heart, etc.) or that she had been treated at any hospital or clinic. There is in the' record photostatic copies of charts of the Charity Hospital which show that the assured had received treatment forty different times between 1933 and November 29, 1943, chiefly for a bad heart. It is also shown that assured had suffered a stroke in 1940. In the year previous to assured’s application for insurance, she had been treated at the Charity Hospital five times for ‘hypertensive and Luet’s heart disease’. The conclusion is inescapable that the assured wilfully misrepresented the condition of her *492 health and, therefore, the defense of fraud is a valid one and must be maintained.”
Clearly the facts of the above-quoted case are different from the facts at bar. There is no question but that there was willful misrepresentation in the Carter case.
In the Fox case, the Court distinctly found that the assured had concealed the fact that she had consulted a physician concerning the presence of blood in her urine, and the fact that she had been informed that this disorder indicated the presence of a serious illness, possibly a malignant growth or a stone in the kidney. Further, 16 days after her first visit, assured consulted her physician again concerning the same trouble and was again advised of the possible serious nature of her illness and told to consult a specialist, and the Court clearly believed that the failure of the assured to disclose the medical treatment and advice for a more or less persistent case of bloody urination was willful and that it constituted a willful misrepresentation of a material fact which might have affected the consent of the insurer to the contract of insurance.
In the Gongre case the assured in the application for insurance made in writing on August 1, 1946 stated that she had never had any disease of the kidneys; that she was in sound health, and that she had not been under the care of any physician within three years previous to the date of the application, whereas the evidence disclosed that in June, 1946 the assured was confined in a sanitarium for several days for treatment of kidney disease and thereafter she went to a specialist in Shreveport where she was told that she had kidney trouble. The Court concluded that the insured prior to applying for the policy sued upon was suffering from a serious ailment and that the condition was known both to the insured and the plaintiff at the time an application for the insurance was signed.
We do not believe that in the present case the insured or the plaintiff knew at the time of the signing of the application nor prior to the death of the insured that the latter was suffering from heart disease. In fact, the record in the case at bar shows that any heart condition of the deceased was of short duration, and as we understand the testimony, it was not a disease of the heart alone that caused the death but a toxemia or poisoning in her system that attacked all of her organs.
Even should we admit that as the result of the pregnancy of the deceased on February 5, 1951 that she had a disease of the heart, we do not believe that the deceased or the plaintiff was aware of this fact. They attributed her trouble to her pregnancy and did not realize and were never told that her illness was of such a serious nature.
The plaintiff is not entitled to a judgment for attorney fees and in that respect the judgment of the lower court is amended, and in all other respects affirmed.